Case 3:12-mc-00042-JBA   Document 4   Filed 06/20/12   Page 1 of 34

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>       **Plaintiff,**<br><br>    v.<br><br>**BRIAN RAYMOND CALLAHAN, HORIZON GLOBAL ADVISORS LTD., HORIZON GLOBAL ADVISORS, LLC, DIVERSIFIED GLOBAL INVESTMENTS (BVI) L.P., THE MASTERS GLOBAL FUND, L.P., FIDUCIARY SELECT INCOME FUND, L.P., HORIZON MILLENNIUM INVESTMENTS, L.P., PANGEA OFFSHORE HIGH YIELD PORTFOLIO, LLC, ADAM MANSON, DISTINCTIVE INVESTMENTS LLC, and DISTINCTIVE VENTURES LLC;**<br><br>       **Defendants,**<br><br>**SHERI MANSON CALLAHAN,**<br><br>      **Relief Defendant.** | Civil Action No. 12-cv-1065<br><br><br> **JURY DEMANDED** |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Securities and Exchange Commission (the "Commission"), for its First

Amended Complaint alleges as follows:

### <u>SUMMARY</u>

1. Defendants Brian Raymond Callahan ("Callahan"), Horizon Global Advisors,

LLC ("HGA LLC"), Horizon Global Advisors Ltd. ("HGA Ltd."), Diversified Global

Investments (BVI), L.P. ("Diversified"), The Masters Global Fund, L.P. ("Masters"), Fiduciary

Select Income Fund, L.P. ("Fiduciary"), Horizon Millennium Investments, L.P. ("Horizon

Case 3:12-mc-00042-JBA Document 4 Filed 06/20/12 Page 2 of 34

Millennium"), and Pangea Offshore High Yield Portfolio, LLC ("Pangea High Yield") engaged in a long-running fraudulent Ponzi scheme in which investors were routinely misled about the nature of their investments and also were unaware of Defendants' frequent misuse and misappropriation of their money. Defendants Adam Judd Manson ("Manson") and two of his entities Distinctive Investments, LLC ("Distinctive Investments"), and Distinctive Ventures, LLC ("Distinctive Ventures") aided and abetted Callahan's fraudulent scheme.

2.      From at least 2005 to January 2012, Callahan raised over $90 million from at least 45 investors for at least five offshore funds (Diversified, Masters, Fiduciary, Horizon Millennium and Pangea High Yield) (collectively, the "Callahan Funds") that he operates directly or through HGA Ltd. and HGA LLC. Callahan's solicitation of investors involved material misrepresentations about the use of their money, the liquidity of their investments and the asset diversification of the Callahan Funds. He represented to a number of U.S. residents that their money in the Callahan Funds would be invested with New York-based hedge funds. Callahan and the Callahan Funds also represented that these investments would be liquid. Although some of the Callahan Funds' assets were invested in the New York-based hedge funds, Callahan misused a portion of investor assets to pay certain other investors seeking redemptions from other Callahan Funds, to make a down payment on a multimillion dollar cooperative unit on Long Island for Callahan and his wife, Relief Defendant Sheri Manson Callahan, and to make payments on his and his wife's residence.

3.      Callahan also improperly diverted assets of the Callahan Funds to his brother-in-law Manson's private real estate project that was facing foreclosure. Distinctive Investments, a Manson-operated entity, provided Callahan with unsecured promissory notes, which falsely stated that they were payable on demand even though they were illiquid. In addition, the face

Case 3:12-mc-00042-JBA   Document 4   Filed 06/20/12   Page 3 of 34

value of the promissory notes that Distinctive Investments issued far exceeded the amount of money that Callahan provided to Manson's real estate project.

4.      Manson, on behalf of his entity Distinctive Investments, signed audit confirmations that misrepresented the amount of Callahan Fund assets loaned to Manson's entities and falsely represented that the promissory notes were "callable."

5.      Callahan engaged in a fraudulent scheme where he used the false promissory notes to hide his misuse of assets of the Callahan Funds and to inflate the amount of assets under management, which resulted in Callahan receiving inflated management fees.

6.      Manson and his two entities aided and abetted Callahan's fraudulent scheme by creating a paper trail of inflated and false promissory notes and false audit confirmations that helped Callahan conceal the scheme.

7.      Callahan also failed to disclose to investors and prospective investors that in 2009, he was barred by the Financial Industry Regulatory Authority ("FINRA") from associating with any FINRA member.

8.      Callahan refused to testify in the Commission's investigation of this matter. Callahan asserted his Fifth Amendment privilege in a deposition taken by the Commission in his action.

9.      In testimony taken by the Commission, Manson asserted his Fifth Amendment privilege in testimony taken by the Commission in response to questions about Callahan raising money from investors, the money Manson and his entities received from the Callahan Funds, and the promissory notes issued to the Callahan Funds.

10.      In February 2012, Callahan disclosed the Commission's investigation in a letter to investors but he gave false assurances to investors that no laws had been broken.

3

11.  By engaging in this misconduct, Callahan, HGA Ltd., HGA LLC and the Callahan Funds violated and, unless restrained and enjoined, will continue to violate, the antifraud provisions of the federal securities laws.

12.  Manson, Distinctive Ventures and Distinctive Investments aided and abetted Callahan's violations of the antifraud provisions and, unless restrained and enjoined, will continue to aid and abet the antifraud provisions of the federal securities laws.

13.  Accordingly, the Commission brings this action to enjoin each Defendant's unlawful acts, to seek disgorgement and prejudgment interest against each Defendant and the Relief Defendant, and to seek civil monetary penalties against Defendants Callahan, Manson, Distinctive Investments, and Distinctive Ventures.

14.  The Court previously granted a temporary restraining order and later entered a preliminary injunction and other relief, including an asset freeze and repatriation order, against Defendants Callahan, HGA Ltd., and HGA LLC.  The Court also appointed a receiver over HGA Ltd. and HGA LLC.  The Commission now seeks a preliminary injunction against the Callahan Funds and seeks to have the receiver appointed over the Callahan Funds.

## JURISDICTION AND VENUE

15.  The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], Sections 21 and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act")[15 U.S.C. § 80b-9(d)].

16.  This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

17.     The Defendants, directly and indirectly, used the means or instrumentalities of interstate commerce or of the mails, in connection with the acts, practices, and courses of business described in this First Amended Complaint.

18.     Venue is appropriate in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because certain acts and transactions constituting the violations occurred in this district.  For example, Defendant Callahan is a resident of Old Westbury, NY and conducted business relating to the funds from his home.  The Articles of Organization for HGA LLC lists Callahan's residence in Old Westbury, NY as its principal office address.  In several offering memoranda for the Callahan Funds, HGA LLC lists its address as located in Great Neck, NY.  Both Callahan and HGA LLC have bank accounts in Rosslyn Heights, NY that received money from the Callahan Funds.

## DEFENDANTS

19.     **Brian Raymond Callahan**, is a resident of Old Westbury, New York.  Callahan either directly, or through a series of related entities that he established, controlled, operated, and managed at least five offshore funds that were not registered with the Commission:  Pangea High Yield; Diversified; Fiduciary; Horizon Millennium; and Masters.  Callahan manages the Callahan Funds directly or through the investment adviser entities he controls, HGA Ltd. and HGA LLC.  Callahan acted as an investment adviser by making the investment decisions for the Callahan Funds and by receiving management fees.

20.     Callahan previously was registered as an Investment Adviser Representative from 2004 to 2006.  Callahan once held Series 7, 24, 63, and 65 licenses and was a registered representative at a number of securities firms.

21. In June 2009, Callahan consented to a FINRA order barring him from associating with any FINRA member, based on allegations that Callahan: (i) created false documents; (ii) engaged in outside business activities and private securities transactions, without prompt written notice to his member firm of these activities (or approval from his member firm for the private securities transactions); and (iii) failed to respond to a FINRA request for documentation and information.

22. Callahan also owns and is CEO of Cromwell AAA Self Storage, LLC, a general warehousing and self-storage business in Cromwell, Connecticut.

23. **Horizon Global Advisors Ltd.** ("HGA Ltd"), a Cayman Islands limited liability company founded by Callahan, is an unregistered investment adviser. HGA Ltd. is listed in offering memoranda as the manager of three of Callahan's offshore funds: Fiduciary (fka Pangea Bridge Investments, L.P.); Diversified; and Horizon Millennium (in 2009). Callahan is the managing member of HGA Ltd. and he makes all of the investment decisions for the Callahan Funds.

24. **Horizon Global Advisors, LLC** ("HGA LLC"), a Connecticut limited liability company formed in 2007 by Callahan, is an unregistered investment adviser. HGA LLC is listed in offering memoranda as the manager of three of Callahan's offshore funds: Masters; and two funds that are currently managed by HGA Ltd., Horizon (in 2007); and Pangea Bridge Investments, L.P. (in 2008). Callahan is the sole member of HGA LLC and makes all investment decisions for the Callahan Funds it manages. Callahan designated another one of his entities, Cromwell AAA Self Storage, LLC, as HGA LLC's agent.

25. **Diversified Global Investments (BVI), L.P.** ("Diversified") (formerly known as Horizon Global Investments, LP), an unregistered investment fund operated and managed by

Callahan through the adviser entities he controls, was incorporated in the British Virgin Islands ("BVI") on November 9, 2006. Callahan is the founder and a director of Diversified Global Partners, Ltd., the general partner to Diversified.

26. **The Masters Global Fund L.P.** ("Masters"), an unregistered investment fund operated and managed by Callahan through the adviser entities he controls, was incorporated in the BVI on September 12, 2007. Callahan is the founder and a director of Diversified Global Partners, Ltd., the general partner to Masters.

27. **Fiduciary Select Income Fund, L.P.** ("Fiduciary") (formerly known as Pangea Bridge Investments, LP), an unregistered investment fund operated and managed by Callahan through the adviser entities he controls, was incorporated in the BVI on August 7, 2008. Callahan is the founder and a director of Diversified Global Partners, Ltd., the general partner to Fiduciary.

28. **Horizon Millennium Investments, L.P.** ("Horizon Millennium"), an unregistered investment fund operated and managed by Callahan through the adviser entities he controls, was incorporated in the BVI on August 7, 2008. Callahan is the founder and a director of Diversified Global Partners, Ltd., the general partner to Horizon Millennium.

29. **Pangea Offshore High Yield Portfolio, LLC** ("Pangea High Yield"), an unregistered investment fund directly operated and managed by Callahan, was formed as a Nevis limited partnership in about 2005. Callahan is the manager, director and member of Pangea High Yield.

30. **Adam Judd Manson ("Manson"),** a resident of New York, New York, is Callahan's brother-in-law. Manson is the sole member of Distinctive Investments, LLC which,

in turn, is the sole member of Distinctive Ventures, LLC. Distinctive Ventures, LLC purchased cooperative rights to a beach resort on Long Island (the "real estate project").

31.     **Distinctive Investments, LLC** ("Distinctive Investments") is a Delaware limited liability company formed in 2005, with an address in Great Neck, New York. Manson is the sole member of Distinctive Investments. Distinctive Investments received money from the Callahan Funds and issued promissory notes to at least two of the Callahan Funds.

32.     **Distinctive Ventures, LLC** ("Distinctive Ventures") is a Delaware limited liability company formed in 2005, with an address in Great Neck, New York. Distinctive Investments is the sole member of Distinctive Ventures. Distinctive Ventures owns cooperative rights to, and operates, the real estate project. Distinctive Ventures received money from the Callahan Funds.

## RELIEF DEFENDANT

33.     **Sheri Manson Callahan** ("Sheri Callahan") is a resident of Old Westbury, New York. She is Callahan's wife and has title to their residence.

## FACTS

**Callahan Solicits Investors through Material Misrepresentations About, Among other Things, the Liquidity of their Investments and the Use of their Funds**

34.     From at least 2005 to January 2012, Callahan raised over $90 million from at least 45 investors for the Callahan Funds. The offering memoranda for the Callahan Funds state that Callahan receives a 1% or 1.5% annual management fee payable in advance at the beginning of each quarter based on the value of the Callahan Funds and most provide for a 20% annual performance fee based on the returns. A number of the investors are U.S. individuals who invested in the Callahan Funds through offshore trusts and insurance policies.

8

35.     Callahan met or spoke to individuals in the U.S. to offer them interests in the Callahan Funds. Callahan solicited investors for the Callahan Funds through misrepresentations regarding, among other things, the use of investor funds and the liquidity of their investments.

36.     Callahan represented to a number of individuals that their money would be pooled in one or more of the Callahan Funds that would then invest in certain New York-based hedge funds. For example, Callahan provided Power Point presentations to several investors stating that investors in the Diversified fund would gain access to the New York-based hedge fund, Kinetics Institutional Partners, L.P. ("New York Hedge Fund #1"), and investors in the Horizon Millennium fund would gain access to the New York-based hedge fund, Millennium USA ("New York Hedge Fund #2"). The Power Point also identified ten U.S.-based hedge funds in which the Masters fund was invested. These hedge funds were part of a portfolio of funds offered by Morgan Stanley ("New York Hedge Fund #3").

37.     Callahan promoted the Callahan Funds as a means for investors to participate in New York Hedge Funds #1, #2 and #3.

38.     Callahan, and the Callahan Funds through offering memoranda, misrepresented to investors that advisers to New York Hedge Funds #1 and #2 were sub-advisers to the Callahan Funds, when, in fact, the New York Hedge Funds ##1-3 are unrelated and unaffiliated with the Callahan Funds.

39.     Callahan, HGA Ltd., HGA LLC, and the Callahan Funds also misrepresented to investors that their investments in the Callahan Funds would be liquid and they could easily withdraw their funds.

40.     Callahan initially did invest some of the assets from the Callahan Funds in New York Hedge Funds ##1-3. The subscription agreements with two of the New York-based hedge

9

funds were entered into in the United States, title to shares of the New York-based hedge funds was transferred in the United States and the purchase orders for shares of the New York-based hedge funds were placed in the United States.

41. As set forth below, however, contrary to Callahan's representations to investors, Callahan diverted a portion of the assets of the Callahan Funds to his brother-in-law Manson's real estate project in return for illiquid unsecured promissory notes with values that exceeded the amount of money actually paid to Manson's entities or for his benefit. The Callahan Funds' investments in these illiquid promissory notes were inconsistent with Callahan's representations and the representations in the Callahan Funds' offering memoranda promising liquidity.

42. Callahan and the Callahan Funds also misused the assets of the Callahan Funds by making redemptions to some investors with the assets of other Callahan Funds. Some investor redemption requests were made from the United States and some of the money transferred to investors for redemptions came from bank accounts in the United States.

43. Callahan provided or authorized the issuance of account statements to investors showing false balances in investors' accounts.

**Callahan Diverts Investor Funds to his Brother In-Law Manson's Real Estate Project in Return for False Promissory Notes**

44. In 2007, after securing financing from a bank, Manson's entity Distinctive Ventures purchased cooperative rights to the real estate project, a beach resort on Long Island . Manson and Distinctive Investments received about $11.1 million from Callahan's Pangea High Yield fund in 2005 and 2006, which was used toward the initial purchase of the real estate project. Manson knew or was reckless in not knowing that Callahan was raising money from high net worth individuals through the Callahan Funds.

Case 3:12-mc-00042-JBA Document 4 Filed 06/20/12 Page 11 of 34

45.     Manson had plans to develop the property, convert the units to cooperatives to sell for several million dollars each, pay off the bank loan and make a profit.  However, after the downturn in the real estate market beginning in 2008, Distinctive Ventures has only been able to sell about nine of the high-priced cooperatives and has not yet converted many of the units to cooperatives.  Distinctive Ventures has had trouble making its bank loan payments.

46.     From 2007 to 2012, unbeknownst to investors, Callahan diverted approximately $21.8 million of investors' money from the Callahan Funds to Distinctive Ventures' real estate project to help make bank loan payments to avoid foreclosure and operate the property.

47.     From 2007 to 2011, Distinctive Investments issued over 50 signed unsecured promissory notes to the Fiduciary and Diversified funds.  The promissory notes falsely state that the Fiduciary and Diversified funds could demand the return of principal and interest upon 30 days notice.  In reality, the promissory notes are illiquid and Callahan and Manson knew the promissory notes could not be repaid on demand.  Callahan's February 2012 letters to investors concede that most of the assets of the Callahan Funds are tied up for years in the real estate project.  These letters also disclose that there is a substantial risk that the lender could foreclose on its loan and seize the remaining unsold units of the real estate project.

48.     The promissory notes also falsely state that the principal amounts were advanced to Distinctive Investments when, in fact, Callahan transferred a fraction of the principal amount toward the real estate project.  For instance, in 2011, even though Callahan only gave about $3.3 million from the Callahan Funds to the real estate project, Callahan received promissory notes from Manson and Distinctive Investments to the Fiduciary fund with a total principal amount of over $14.5 million.  The principal amounts and interest of the promissory notes were used to calculate the Callahan Funds assets under management.  Because the amounts on the promissory

Case 3:12-mc-00042-JBA Document 4 Filed 06/20/12 Page 12 of 34

notes are inflated, the assets of the Callahan Funds under management were inflated. As a result, Callahan received inflated management fees based on the inflated assets under management. The promissory notes are included in the Callahan Funds' financial statements, which accordingly are also inaccurate.

49. Additionally, instead of receiving management fees at the beginning of each quarter as specified in the Callahan Funds' offering memoranda, Callahan improperly obtained management fees throughout and after the quarters.

### Callahan Commingles Investor Monies and Misuses Fund Assets to Pay Investors in Other Funds

50. Callahan defrauded the Callahan Funds and their investors by commingling and misusing Callahan Fund assets. Callahan and the Callahan Funds engaged in a fraudulent scheme to divert assets from some Callahan Funds to pay redemptions to investors in other Callahan Funds.

51. Until sometime in 2010, Callahan directed investors to wire their investments from their United States bank accounts to several offshore accounts in the BVI. In about 2010, Callahan began advising investors to wire their funds to a Bermuda client funds account ("Bermuda Client Funds Account").

52. Callahan misused Callahan Fund assets in these accounts by directly paying redemptions to investors in other Callahan Funds.

53. For instance, on about June 3, 2010, Callahan deposited $350,000 into the Bermuda Client Funds Account that he had redeemed from New York Hedge Fund #1. The $350,000 were assets of the Diversified fund. On about June 7, 2010, Callahan misused $160,000 of these Diversified fund assets to pay redemptions to two Fiduciary fund investors.

54.     In a second example, on about June 24, 2010, a Fiduciary fund investor's investment of $306,275 was deposited into the Bermuda Client Funds Account.  On about June 24, 2012, Callahan misused $90,000 of these Fiduciary fund assets to pay a redemption to a Horizon Millennium fund investor.

55.     In a third example, on about July 15, 2010, Callahan deposited $2.2 million into the Bermuda Client Funds Account that he had redeemed from New York Hedge Fund #2.  The $2.2 million were assets of the Horizon Millennium fund.  From about July 15, 2010 to July 19, 2010, Callahan misused over $1.7 million of these Horizon Millennium fund assets to pay redemptions to investors in the Diversified, Fiduciary and Masters funds.

56.     Callahan also wired some of the assets of the Callahan Funds from the BVI accounts or the Bermuda Client Funds Account to several United States bank accounts established by his father-in-law.  One of these accounts was an escrow account (the "Escrow Account"), which was established in 2007 by Callahan's father-in-law to hold payments from purchasers and subscribers relating to the real estate project.  In the Escrow Account, assets from all of the Callahan Funds were commingled and then sometimes improperly transferred to other investors.

57.     For example, in late February 2010, Callahan improperly transferred Fiduciary fund assets to two other Callahan Funds, Pangea High Yield and Diversified.  On February 26, 2010, an investor in the Fiduciary fund wired a $1.2 million investment to an account in the BVI.  On March 2, 2010, Callahan then wired $485,000 of this Fiduciary investment to the Escrow Account and on the same day he transferred all of these assets to two other funds, Pangea High Yield ($368,000) and Diversified ($117,000).  On March 2, 2010, Callahan also wired $350,000

13

from the Pangea High Yield account, which was in the United States, to a different investor in Pangea High Yield to redeem his investment.

58. Callahan obtained a promissory note dated March 2, 2010 from Manson and Distinctive Investments falsely stating that the Fiduciary fund had advanced $485,000 to Distinctive Investments, even though no Fiduciary fund assets were actually given to the real estate project at that time and the monies were instead transferred to Pangea High Yield and Diversified.

59. In another example, in March 2010, Callahan received a $990,000 Fiduciary subscription from an investor and then Callahan misused a portion of this money to make a redemption to an investor in another one of Callahan's funds, Pangea Global Opportunities Portfolio, LP. On March 24, 2010, after the investor wired $990,000 into a Fiduciary account at a bank in the BVI, Callahan transferred $895,000 to the Escrow Account. From the Escrow Account, Callahan transferred $892,000 to two other funds, Pangea High Yield ($640,000) and Diversified ($52,000), and to Distinctive Ventures ($200,000). On March 25, 2010, Callahan wired $440,000 from the Pangea High Yield account to a different investor in Callahan's fund, Pangea Global Opportunities Portfolio, LP, to redeem his investment.

60. While only $200,000 went to Manson and Distinctive Ventures on March 24, 2010, Callahan obtained a promissory note dated March 24, 2010 from Manson and Distinctive Investments falsely stating that the Fiduciary fund had advanced $895,000 to Distinctive Investments.

61. In a third example, in early 2010, Callahan received subscriptions from two investors for the Fiduciary fund which he then diverted to two other Callahan Funds, Diversified and Pangea High Yield. On January 28, 2010, Callahan received a $70,225 subscription for the

14

Fiduciary fund from an investor.  Callahan had marketed the Fiduciary fund to this investor as being similar to a money market fund and never disclosed that money in the Fiduciary fund could be transferred to other Callahan Funds.  On February 5, 2010, Callahan received a $128,000 subscription for the Fiduciary fund from another investor.  Both subscriptions came via wire transfer into a Fiduciary account at a bank in the BVI.

62.     Callahan transferred money obtained from these subscriptions as follows:  On February 2, 2010, Callahan wired $19,870.66 to his HGA LLC bank account, which was in the United States, and on February 8, 2010, he wired $160,000 to the Escrow Account.  On the following day, February 9, 2010, Callahan improperly transferred the $160,000 out of the Escrow Account to two other funds, Pangea High Yield ($50,000) and Diversified ($110,000).

63.     Although the $160,000 went to Pangea High Yield and Diversified, Callahan obtained a promissory note dated February 8, 2010 from Manson and Distinctive Investments falsely stating that the Fiduciary fund had advanced $160,000 to Distinctive Investments, even though no Fiduciary fund assets were actually given to the real estate project.

64.     Manson knew he was issuing promissory notes, through Distinctive Investments, for amounts that exceeded what he received from the Callahan Funds for the real estate project. Manson knew these promissory notes falsely stated they were payable on demand, when the promissory notes could not be repaid on demand.  Manson also knew Callahan was redeeming old investors in certain Callahan Funds with new investor money from a different Callahan Fund, and that the promissory notes he and Distinctive Investments issued included the amounts that Callahan was using to redeem prior investors.

Case 3:12-mc-00042-JBA   Document 4   Filed 06/20/12   Page 16 of 34

**Callahan Misuses Fund Assets for his Personal Benefit**
**& for the Benefit of Sheri Callahan**

65.     Callahan misused assets of the Callahan Funds for his personal benefit and for the benefit of his wife, Sheri Callahan.  For example, in March 2011, Callahan engaged in a series of transfers through numerous accounts and misused assets of the Callahan Funds for a down payment on a $3.35 million cooperative unit at the real estate project that Callahan and his wife purchased.  On March 10, 2011, an investor wired $1,120,000 to Callahan's Bermuda Client Funds Account for an investment in the Horizon Millennium fund.  On March 17, 2011, Callahan transferred $930,000 in two wires from the Bermuda Client Funds Account to the Escrow Account.  On March 17, 2011, Callahan emailed Manson and his father-in-law, with instructions for his father-in-law to transfer $455,600 of the money from the Escrow Account to Callahan's HGA LLC bank account stating, "I need this amount to fund [a lending bank] account for the closing."  On March 18, 2011, Callahan transferred the $455,600 from HGA LLC's account to his United States personal bank account and then to the United States lending bank which issued a $2,278,000 mortgage.  Callahan misappropriated the $455,600 to help purchase the cooperative unit in his and his wife's name.

66.     Manson and Distinctive Investments helped conceal Callahan's misuse of Callahan Fund assets by issuing two promissory notes that falsely stated the principal sums of $736,000 and $194,000 had been advanced from Callahan's Fiduciary Fund to Distinctive Investments.  Manson was informed in Callahan's March 17, 2011 email that $455,000 of these amounts were actually being used by Callahan for a down payment on a cooperative unit at Manson's real estate project that Callahan was buying for himself and his wife.

67.     Callahan not only used the false promissory notes to hide his misuse of assets of the Callahan Funds, but he also used the false promissory notes to inflate the amount of assets under management, which resulted in Callahan's receiving inflated management fees.

### Manson and Distinctive Investments Issued False Audit Confirmations

68.     Manson and Distinctive Investments issued audit confirmations to the auditors of the Callahan Funds that misrepresented:  (1) the outstanding principal balances on promissory notes issued to the Diversified and Fiduciary funds; and (2) that the promissory notes were callable.  By misleading the auditors, Manson helped Callahan hide the true financial condition of the Diversified and Fiduciary funds.

69.     For example, on about March 27, 2009, Callahan wired $1.867 million of Fiduciary fund assets into the Escrow Account.  On March 27, 2009, Callahan sent an email to Manson and Callahan's father-in-law requesting that Manson sign an attached promissory note to the Fiduciary fund for $1.867 million, even though Callahan said he was providing only a fraction of this amount ($318,362.50) to Manson for the monthly interest payment on the bank loan for the real estate project.  Callahan explained in the email that the remaining balance was for redemptions that Callahan was fulfilling and that he was "refinancing our original debt." Callahan told Manson in the March 27, 2009 email, "This all needs to run through 'Distinctive' for accounting/audit purposes."  In response to Callahan's request, Manson and Distinctive Investments issued a promissory note dated March 27, 2009 to Callahan's Fiduciary fund which misrepresented that $1.867 million had been advanced to Distinctive Investments and that the note was payable in full upon demand.

70.     In connection with the 2010 audits of the financial statements of the Diversified and Fiduciary funds, on May 25, 2011, the auditor sent emails to Manson attaching two letters

17

Case 3:12-mc-00042-JBA   Document 4   Filed 06/20/12   Page 18 of 34

dated May 16, 2011 signed by Callahan, on behalf of Diversified Global Ltd., the general partner of the Diversified and Fiduciary funds. Callahan's May 16, 2011 letters requested that Manson and Distinctive Investments send to the auditors a confirmation letter for each loan entered into with the Diversified and Fiduciary funds.

71. On about November 3, 2011, Manson, as manager of Distinctive Investments, furthered the scheme by signing a "Confirmation to Auditors" falsely confirming that the outstanding principal balance on the March 27, 2009 promissory note to the Fiduciary fund was $1.867 million and that the promissory note was "callable" (i.e., payable upon demand).

72. Callahan sent similar emails to Manson with other proposed promissory notes for Manson's signature, where Callahan disclosed the total amount of Callahan Fund assets he was transferring to the Escrow Account, the portion of that amount he was transferring to Manson and Distinctive Ventures for the real estate project, and the amount he was transferring to other Callahan bank accounts to "refinance" earlier debt (*i.e.*, redeem prior investors). At Callahan's request, Manson and Distinctive Investments issued inflated promissory notes for the total amount of Callahan Fund assets that Callahan transferred to the Escrow Account rather than for the smaller amount Manson and his entities actually received.

73. In addition, at Callahan's request, Manson, on behalf of Distinctive Investments, signed "Confirmations to Auditors" for many of the promissory notes, including the promissory notes mentioned above dated February 8, 2010, March 2, 2010 and March 24, 2010. The confirmations misrepresented the amount of Callahan Fund assets loaned to Manson's entities and falsely represented that the promissory notes were "callable."

74. For instance, on about June 5, 2009, Callahan wired $1.2 million from the Fiduciary fund account to the Escrow Account. On June 8, 2009, Callahan sent an email to

18

Case 3:12-mc-00042-JBA   Document 4   Filed 06/20/12   Page 19 of 34

Manson and Callahan's father-in-law mentioning his recent transfer of the $1.2 million into the Escrow Account. Callahan directed that $731,000 of this amount be wired to a Diversified fund account and $175,000 be wired to Callahan's HGA LLC account. Callahan stated in the June 8, 2009 email that the balance ($294,000) was for the interest payment on the real estate project. On about June 8, 2009, the $294,000 was transferred from the Escrow Account to a Distinctive Ventures bank account. After the deposit of the $175,000 into the HGA LLC account, Callahan wired over $71,000 to an investor. Even though Distinctive Ventures only received $294,000 of the $1.2 million, Distinctive Investments issued a promissory note dated June 3, 2009 to the Fiduciary fund which misrepresented that $1.2 million had been advanced to Distinctive Investments and that the note was payable upon demand.

75.     On about November 3, 2011, Manson, as manager of Distinctive Investments, signed a "Confirmation to Auditors" falsely confirming that the outstanding principal balance on this promissory note was $1.2 million and that the promissory note was "callable."

76.     In another example, on about March 24, 2010, Callahan wired $895,000 of Fiduciary fund assets into the Escrow Account. On March 24, 2010, Callahan sent an email to Manson and Callahan's father-in-law indicating that he was providing $202,000 to Manson for the monthly interest payment on the bank loan for the real estate project. Callahan explained in the email that the remaining balance was "for refinancing the existing debt" and directed the transfer of $641,000 to a Pangea High Yield account and $52,000 to a Diversified account. Within the next few days, Callahan paid out redemptions of approximately $520,000 from the Pangea High Yield account. Distinctive Investments issued a promissory note dated March 24, 2010 to Callahan's Fiduciary fund which misrepresented that $895,000 had been advanced to

19

Distinctive Investments and that the note was payable upon demand.  In fact, Manson and his entity Distinctive Ventures had only received about $200,000 of these monies.

77.     On about November 3, 2011, Manson, as manager of Distinctive Investments, signed a "Confirmation to Auditors" falsely confirming that the outstanding principal balance on this promissory note was $895,000 and that the promissory note was "callable."

78.     In yet another example, on December 21, 2010, Callahan sent an email to Manson and Callahan's father-in-law requesting that Manson sign an attached promissory note to the Fiduciary fund for $1,861,000, even though Callahan said he was providing only $192,000 to Manson for the January 1st interest payment on the bank loan for the real estate project. Callahan explained in the email that the remaining balance ($1.669 million) was "to refinance out debt currently at 4.5% on the [real estate project]" and directed the transfer of the $1.669 million to his HGA LLC bank account.  On about December 22, 2010, $1,861,000 was transferred into the Escrow Account from the Bermuda Client Funds Account and $1,669,000 was then transferred from the Escrow Account to Callahan's HGA LLC bank account.  On about December 23, 2010, Callahan paid out approximately $1.644 million from his HGA LLC account to an investor.  In response to Callahan's request, Distinctive Investments issued the promissory note dated December 21, 2010 to Callahan's Fiduciary fund which misrepresented that $1.861 million had been advanced to Distinctive Investments and that the note was payable upon demand.

79.     On about November 3, 2011, Manson, as manager of Distinctive Investments, signed a "Confirmation to Auditors" falsely confirming that the outstanding principal balance on this promissory note was $1.861 million and that the promissory note was "callable."

80.     In 2011, Manson and Distinctive Investments issued over a dozen promissory notes where he and his entities received no money from the Callahan Funds.  On November 8, 2011, Manson complained in an email to Callahan that Callahan was repaying old investors with new investor money instead of paying those amounts to Manson for the real estate project:

> Brian - I know you are under pressure in refinancing and coming up with funds but [my father] is concerned that more than a month has gone by since he provided the October payment.  On another note, we also depleted the [real estate project] operating account for the September Payment and are holding all important expenditures as we do not have the funds necessary to start the critical repairs to the property for operations next summer.  At this time of the year, we do not have funds coming in from operations to pay for salaries and projects.

81.     On November 8, 2011, Callahan responded by email to Manson explaining that he had to repay a couple million dollars more to old investors before being able to give money to the real estate project, "I am under enormous pressure to pay people back and subject to being sued on a weekly basis. . . Doing my best.  I have a couple million dollars more to refinance with people in the short term and then I can breathe for a moment to address this issue."  After this email exchange, Distinctive Investments issued three more inflated promissory notes dated November 22, 2011, December 8, 2011 and December 29, 2011.

### Sheri Callahan Benefited from Callahan's Fraud

82.     Sheri Callahan received money derived from Callahan's fraudulent scheme.  For instance, Callahan used investor money to purchase a residence located at 47 Clock Tower Lane, Old Westbury, New York ("Callahan Residence") for Callahan and his wife.  Title to the Callahan Residence is in the name of Callahan's wife, Sheri Callahan.  From 2008 through 2012, over $500,000 in mortgage payments for the Callahan Residence originated from accounts where Callahan directed investors to wire their money.  Investor funds used for the Callahan Residence were fraudulently obtained by Callahan, who received inflated management fees and made

21

misrepresentations to investors about, among other things, the liquidity of the investments and the use of investors' money.  Callahan asserted his Fifth Amendment privilege with respect to all questions about his scheme, including the source of funds he used to pay for the Callahan Residence.

83.     In addition, from 2009 to 2011, Callahan wrote a number of checks totaling over $22,000 to Sheri Callahan from an account where Callahan's inflated management fees were deposited.  Money paid to Sheri Callahan originated from the Bermuda Client Funds Account where investors were instructed to wire their money.

### Callahan Made Material Misstatements and Omissions to Fund Investor #1

84.     After raising $270,000 in October 2008, from a California teacher ("Investor #1") for the Horizon Millennium and Masters funds, Callahan sent a series of emails to Investor #1 in late January 2009 regarding an additional investment opportunity in his Fiduciary fund, which he described as a short term/fixed income cash fund.  Callahan informed Investor #1 by email that, "We also now have opened up our short term institutional cash fund to smaller account values at [a BVI] Bank."

85.     Investor #1 asked Callahan about the type of bank account in which her money would be invested and whether her deposit could be guaranteed like a certificate of deposit. Investor #1 specifically noted that she did not want to risk the principal of her investment.

86.     Callahan misrepresented to Investor #1 that her investment in the Fiduciary fund would be in a separate capital account in the name of her offshore trust (through which she invested) at a BVI Bank and he described the Fiduciary fund as a "short term cash/fixed income solution."  Based on Callahan's representations, Investor #1 invested $250,000 in the Fiduciary fund in February 2009.

22

87.    Contrary to Callahan's representations to Investor #1 about the liquidity of her investment in the Fiduciary fund, the money Callahan raised for the Fiduciary fund was not in liquid investments.  In Callahan's February 2012 letters to investors which was emailed to Investor #1, Callahan asserted that the only assets of the Fiduciary fund were illiquid promissory notes from Distinctive Investments.

88.    Callahan's February 2012 letters to investors disclosed the Commission's investigation but gave false assurances that no laws had been broken.  Callahan's February 2012 letters to investors, which were from Diversified Global Partners, LTD. and Brian Callahan, stated, "The General Partner does not believe that any actions were taken with respect to the Partnerships that violated applicable U.S. or BVI regulation."

89.    In January 2012, Investor #1 asked Callahan for the return of her investments but she has not received her money back.  Despite Callahan's assurances to Investor #1 that her money would be safe and segregated in a separate account, in February 2012, Investor #1 called the BVI Bank to verify the existence of her bank account there but was told they did not have an account in her name and that the account to which she had wired her money had been closed since May 2010.

**Callahan Made Material Misstatements and Omissions to Fund Investor #2**

90.    Between 2007 and 2011, Callahan raised a total of about $2.9 million from Investor #2, a small business owner in Kentucky.  Investor #2 invested in the Horizon Millennium, Diversified and Masters funds.  Callahan made material misrepresentations and omissions to Investor #2 about the use of assets of the Callahan Fund, the liquidity of his investments, the diversification of Fund assets, and Callahan's disciplinary history.

23

91.    In emails, and oral and written presentations, Callahan represented to Investor #2 that money in the Horizon Millennium fund would be invested in New York Hedge Fund #2, money in the Diversified fund would be invested in New York Hedge Fund #1, and an investment in the Masters fund would be invested in ten specific investment funds, which were offered by New York Hedge Fund #3.

92.    Callahan also assured Investor #2 that his investments would be liquid.  For instance, in January 2010, Callahan said that his Horizon Millennium fund keeps 30% of its investments in cash for liquidation purposes.  In addition, in a December 29, 2007 email, Callahan told Investor #2:  "One of my funds, The Masters Global Fund has several managers with credit market expertise that will be buying these debt pieces at huge discounts to provide much needed short term liquidity to current holders/sellers."

93.    Contrary to Callahan's representations, a large portion of the money Investor #2 invested in the Callahan Funds was never invested in the underlying hedge funds that Callahan promised.  For instance, in May 2011, Investor #2 invested $600,000 in the Horizon Millennium fund but Callahan has not invested any money with New York Hedge Fund #2 since April 2008.

94.    In addition, in November 2011, Callahan raised another $100,000 from Investor #2 for the Diversified fund.  Callahan sent Investor #2 an email on November 15, 2011, representing that the Diversified portfolio is designed with "an extraordinary emphasis on diversification and holds medium term private and public debt in currently 11 sectors on a global basis via New York Hedge Fund #1."  Callahan knew that none of Investor #2's November 2011 investment was invested with, or managed by the investment manager for New York Hedge Fund #1, as Callahan's last investment in New York Hedge Fund #1 was in March 2008.

24

95.     Callahan's November 15, 2011 email also listed representative holdings of the Diversified fund.  One of the holdings listed was Distinctive Investments, which purportedly constituted only 9.75% of Diversified's total portfolio.  Callahan's February 2012 letters to investors, however, represent that promissory notes from Distinctive Investments actually make up over 97% of the Diversified fund.

96.     Callahan also sent Investor #2 a Diversified fund offering memorandum that materially misrepresents its liquidity and portfolio diversification.  The offering memorandum lists HGA Ltd as the fund manager and Callahan as HGA Ltd's Principal, who is responsible for managing the fund.  The offering memorandum represents investors may withdraw as of the last day of each calendar month by providing written notice on or before that date, and that the proceeds generally would be paid within thirty (30) days of the withdrawal date.  The offering memorandum also states that "[t]he fund seeks rigorous portfolio diversification, investing in historically uncorrelated investment opportunities and positions across all sectors, with an emphasis on the preservation of capital."  To the contrary, Callahan admits in Callahan's February 2012 letters to investors that most of the assets of the Callahan Funds will be tied up for years in his brother-in-law's real estate project and there is a substantial risk that the lender could foreclose on its loan and seize the remaining unsold units of the real estate project.

97.     Callahan also failed to disclose his disciplinary record to Investor #2.  On June 2, 2009, Callahan consented to a permanent bar from associating with any FINRA member.  Investor #2 did not become aware that Callahan had been barred by FINRA until January or February 2012, and would not have invested with Callahan if he had known about the FINRA bar against Callahan.

25

**Callahan Made Material Misstatements and Omissions to Fund Investor #3**

98.     Callahan solicited Investor #3, who resides in Wisconsin, to invest in two of the Callahan Funds.  Between 2008 and 2011, Investor #3 (through his family's offshore trust) invested more than $380,000 in the Diversified fund and more than $450,000 in the Fiduciary fund.  Callahan made material misrepresentations and omissions to Investor #3 about the use of his funds, liquidity of the investments and Callahan's disciplinary history.

99.     In 2008, Callahan sent Investor #3 a Power Point presentation promoting the Diversified, Horizon Millennium, and Masters funds.  Callahan gave a presentation to Investor #3 over the phone and specifically brought to Investor #3's attention a slide from the Power Point presentation showing that the annual performance of the Diversified fund was the annual performance of New York Hedge Fund #1.  Callahan knew that these representations were false and misleading because none of the money that Investor #3 invested in the Diversified fund went to New York Hedge Fund #1, as Callahan made no subscriptions after March 2008 to New York Hedge Fund #1 on behalf of the Diversified fund, and Investor #3 began investing in the Diversified fund in October 2008.

100.     Callahan also misrepresented to Investor #3 that the Diversified fund had no withdrawal restrictions and that investments in the Diversified fund would be liquid.  In reality, Callahan diverted some of Diversified assets to the real estate project in return for illiquid, unsecured promissory notes of questionable value.

101.     In about May 2009, Callahan marketed the Fiduciary fund to Investor #3 as being similar to a money market fund and that his investment in the Fiduciary fund would be liquid.  Callahan never disclosed to Investor #3 that money in the Fiduciary fund could be transferred to other funds that Callahan managed.  In fact, as alleged above, Callahan improperly transferred

26

Investor #3's $70,225 January 2010 Fiduciary subscription to two other Callahan Funds, Pangea High Yield and Diversified.

102.    In about January 2012, Investor #3 asked Callahan whether he could redeem $400,000 of his investments within two days notice.  Callahan falsely assured Investor #3 that this could be done.  In actuality, Callahan could not honor this request because he had almost no liquid assets remaining.

103.    It was not until January 2012, that Investor #3 learned Callahan had been permanently barred by FINRA from associating with any FINRA member.  After learning of this disciplinary history, Investor #3 requested total liquidation of his investments in the Diversified and Fiduciary funds.  Investor #3 has not received the return of his investments in response to his redemption request.

**The Callahan Funds had only $6.4 Million in Liquid Assets as of December 31, 2011**

104.    Callahan produced documents to the Commission purporting to show that as of December 31, 2011, the total approximate value of the Callahan Funds was over $65 million. However, as of December 31, 2011, the value of the Callahan Funds' investments in the New York Hedge Funds was only about $6.4 million.  In addition, the Pangea High Yield fund had a bank account with a balance of less than $1,000.  The following chart shows the breakdown of the purported approximate value of the Callahan Funds, the approximate value of the identified liquid assets for each fund, and the shortfalls.

| APPROXIMATE TOTAL LIQUID ASSETS (as of Dec. 31, 2011) | | | |
|---|---|---|---|
| Fund | Value | Value of liquid assets | Shortfall |
| Diversified | $10,649,317 | $588,655 | $10,060,662 |
| Horizon Millennium | $9,998,359 | $5,126,670 | $4,871,689 |

27

Case 3:12-mc-00042-JBA   Document 4   Filed 06/20/12   Page 28 of 34

| Masters | $3,281,144 | $739,864 | $2,541,280 |
|---|---|---|---|
| Fiduciary | $30,683,295 | -- | $30,683,295 |
| Pangea | $14,421,438 | $999 | $14,420,439 |
| **TOTALS*** | **$65,058,353** | **$6,456,188** | **$58,602,165** |

*The investments of Horizon Millennium and Masters in Diversified have been excluded from the total.

105.    According to Callahan's February 2012 letters to investors on behalf of the general partner of four of the Callahan Funds, the remaining assets of those four Callahan Funds are the unsecured demand promissory notes, issued by Distinctive Investments, totaling about $60.3 million.  Callahan also produced documents to the Commission showing an additional outstanding promissory note to the Pangea High Yield fund worth over $14 million. As described above, the promissory notes are actually illiquid and unsecured, and the amount of money Callahan gave to his brother-in-law for the real estate project is much less than the face amounts on the promissory notes.

## CLAIM ONE

**Violations of Section 17(a)(1), (2) and (3) of the Securities Act**
(Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary,
Horizon Millennium, Pangea High Yield)

106.    The Commission realleges and reincorporates paragraphs 1 through 105 as if fully set forth herein.

107.    By engaging in the conduct described above, Defendants Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material

28

facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities offered or sold by Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield.

108.   By reason of their actions alleged herein, Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield violated Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

## CLAIM TWO

**Aiding & Abetting Violations of Section 17(a)(1) and (3) of the Securities Act**
(Manson, Distinctive Investments, Distinctive Ventures)

109.   The Commission realleges and reincorporates paragraphs 1 to 3 to 6, 9, 12, 13, 15 to 19, 30 to 32, 41, 42, 44 to 48, 50, 56 to 81, and 104 to 105 as if fully set forth herein.

110.   By engaging in the conduct described above, Defendants Manson, Distinctive Investments, and Distinctive Ventures knowingly or recklessly provided substantial assistance to Callahan in his violations of Section 17(a)(1) and (3) of the Securities Act.

111.   By reason of their actions alleged herein, Manson, Distinctive Investments, and Distinctive Ventures aided and abetted Callahan's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## CLAIM THREE

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)**
(Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and
Pangea High Yield)

112.   The Commission realleges and reincorporates paragraphs 1 through 105 as if fully set forth herein.

29

113. By engaging in the conduct described above, Defendants Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

114. By reason of their actions alleged herein, Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) [17 C.F.R. 240.10b-5(a), (b) and (c)] thereunder.

## CLAIM FOUR

### Aiding & Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder
(Manson, Distinctive Investments, Distinctive Ventures)

115. The Commission realleges and reincorporates paragraphs 1 to 3 to 6, 9, 12, 13, 15 to 19, 30 to 32, 41, 42, 44 to 48, 50, 56 to 81, and 104 to 105 as if fully set forth herein.

116. By engaging in the conduct described above, Defendants Manson, Distinctive Investments, and Distinctive Ventures knowingly or recklessly provided substantial assistance to Callahan in his violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. 240.10b-5(a) and (c)] thereunder.

Case 3:12-mc-00042-JBA   Document 4   Filed 06/20/12   Page 31 of 34

117.     By reason of their actions alleged herein, Manson, Distinctive Investments, and Distinctive Ventures aided and abetted Callahan's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. 240.10b-5(a) and (c)] thereunder.

## CLAIM FIVE

### Violations of Sections 206(1) & (2) of the Advisers Act
(Callahan, HGA Ltd., HGA LLC)

118.     The Commission realleges and reincorporates paragraphs 1 through 105 as if fully set forth herein.

119.     By engaging in the conduct described above, Defendants Callahan, HGA Ltd., and HGA LLC, by use of the means or instrumentalities of interstate commerce or of the mails, and while acting as investment advisers: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

120.     By reason of their actions alleged herein, Callahan, HGA Ltd., HGA LLC violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

## CLAIM SIX

### Aiding & Abetting Violations of Sections 206(1) and (2) of the Advisers Act
(Manson, Distinctive Investments, Distinctive Ventures)

121.     The Commission realleges and reincorporates paragraphs 1 to 3 to 6, 9, 12, 13, 15 to 19, 30 to 32, 41, 42, 44 to 48, 50, 56 to 81, and 104 to 105 as if fully set forth herein.

122.     By engaging in the conduct described above, Defendants Manson, Distinctive Investments, and Distinctive Ventures knowingly or recklessly provided substantial assistance to Callahan in his violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

31

123. By reason of their actions alleged herein, Defendants Manson, Distinctive Investments, and Distinctive Ventures aided and abetted Callahan's violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

## CLAIM SEVEN

### Violations of Section 206(4) of the Advisers Act & Rule 206(4)-8
(Callahan, HGA Ltd., HGA LLC)

124. The Commission realleges and reincorporates paragraphs 1 through 105 as if fully set forth herein.

125. By engaging in the conduct described above, Defendants Callahan, HGA Ltd., HGA LLC, while acting as investment advisers to pooled investment vehicles, (1) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in the pooled investment vehicles; and (2) otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the pooled investment vehicle.

126. By reason of their actions alleged herein, Callahan, HGA Ltd., HGA LLC violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.C 275.206(4)-8] thereunder.

## CLAIM EIGHT

### Equitable Disgorgement against Relief Defendant
(Sheri Callahan)

127. The Commission realleges and reincorporates paragraphs 2, 33, 65 to 67, 82, and 83 as if fully set forth herein.

32

128. Relief Defendant Sheri Callahan obtained funds and property as a result of the violations of the securities laws by Callahan.

129. Sheri Callahan should be required to disgorge all ill-gotten gains which inured to her benefit under the equitable doctrines of disgorgement, unjust enrichment, and constructive trust.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

i. Enter a final judgment:

    a. Permanently restraining and enjoining Defendants Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, and Pangea High Yield, their agents, servants, employees and attorneys and all persons in active concert or participation with them, from violating directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 17j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder;

    b. Permanently restraining and enjoining Defendants Callahan, HGA Ltd., and HGA LLC, their agents, servants, employees and attorneys and all persons in active concert or participation with them, from violating directly or indirectly, Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. § 80b-6(1), (2) and (4)] and Rule 206(4)-8 [17 C.F.C 275.206(4)-8] thereunder;

    c. Permanently restraining and enjoining Defendants Manson, Distinctive Investments and Distinctive Ventures, their agents, servants, employees and attorneys and all persons in active concert or participation with them, from

violating directly or indirectly, Section 17(a)(1) and (3) of the Securities Act  [15 U.S.C. § 17q(a)(1) and (3)];  Section 10(b) of the Exchange Act [15 U.S.C. § 17j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. 240.10b-5(a) and (c)] thereunder; and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)];

d. Ordering Defendants Callahan, HGA Ltd., HGA LLC, Diversified, Masters, Fiduciary, Horizon Millennium, Pangea High Yield, Manson, Distinctive Investments, Distinctive Ventures, and Relief Defendant Sheri Callahan to disgorge ill-gotten gains obtained through the violative conduct alleged in this First Amended Complaint and directing them to pay prejudgment interest thereon;

e. Ordering Defendant Callahan, Manson, Distinctive Investments, and Distinctive Ventures to pay civil penalties pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act [15 U.S.C. §§ 77t(d), 78u(d)(3), 80b-9(e)]; and

ii. Grant such other relief as the Court deems appropriate.

Dated:          May 31, 2012

                                        Respectfully submitted,

                                            s/ Dean M. Conway

                                        _____
                                        Dean M. Conway DC-4477
Of Counsel:                             Holly Pal
                                        Linda French
Antonia Chion                           Ann Rosenfield
Lisa Deitch                             Securities and Exchange Commission
                                        Mail Stop 4010
                                        100 F Street, N.E.
                                        Washington, D.C.  20549
                                        Tel: 202-551-4412 (Conway)
                                        Fax: 202-772-9246 (Conway)